## Hanna v. Commonwealth.

(Decided February 26, 1932.)

BARNES & SMITH for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

On a day in the latter part of February, 1931, at about noon, the appellant and defendant below, Mark Hanna, shot and killed Sherman Bellamy in Ohio county.

He was later indicted by the grand jury of that county and charged with murder. At his trial he was convicted of voluntary manslaughter and punished by confinement in the penitentiary for five years. His motion for a new trial was overruled, and from the verdict and judgment pronounced thereon he prosecutes this appeal. In his motion for a new trial numerous alleged errors were relied on, but on this appeal his counsel abandoned all of them except two, and which are: (1) Error in the admission and rejection of testimony, and (2) improper argument of prosecuting counsel. Before taking them up for discussion and determination, it might be proper to state that none of the grounds contained in the motion, and not argued on this appeal, are meritorious; but, since they are not relied on in brief for appellant, we will neither mention nor discuss them, but will at once proceed to a consideration of the two alleged errors above mentioned and dispose of them in the order named.

1. The disposition of error 1 calls for a statement of the substance of the material facts developed by the testimony. The deceased, Sherman Bellamy, his brother John Bellamy, and the defendant were neighbors; the first two owning farms through which or along which ran east and west a public road. A creek separated the farms of the two brothers on the south of that road and it ran for some distance from the road almost due south and at practically right angles to it. Less than half a mile south of the road was another country road somewhat parallel to the public one, and not far from that point the defendant resided on a farm bordering on or near to the creek. For a great number of years the public had traveled the bed of that creek as far as the public road, and up to about 1910 the county authorities did some work on it in the way of repairing it; but there was never any court order opening any public road along and over the bed of the creek, the bottom of which was practically covered with gravel, and we conclude from the testimony that the passway over the bed of the creek was nothing more than a neighborhood road. But whether that be true or not is not material, as will become apparent in the course of this opinion.

The creek where it formed the line between the farms of the deceased and his brother, John, became filled with gravel due to washings and floods until it became greatly impaired as a natural drainage, and the

two Bellamys determined to clean it out so that it would carry away the water of ordinary rains and prevent the overflow of their contiguous farms. Pursuant thereto they did lower the bed of the creek by removing accumulated gravel at points and which greatly enraged defendant, who claimed the right to travel the creek bed as a road, even contending that it was a public one, but that his right to travel it existed whether or not it was a public one, and he determined to take steps looking to the enforcement of such rights. The first one was the swearing out of a warrant against the two Bellamys, which of course was upon the theory that the creek bed was a public road and that the two persons whom he sought to have arrested were guilty of unlawfully obstructing it. Notwithstanding such criminal proceedings, defendant conceived the idea that he had the right to restore the bed of the creek by filling in the excavations that the two Bellamys had made, and on the morning of the fatal day he took his team and necessary implements for that purpose and began the work of restoration. He carried along with him his automobile, his wife, and his five-year-old daughter, together with a shotgun and a number of shells.

The deceased, whose residence was about 400 yards away, and upgrade from the spot where defendant was so engaged, when he returned from his work on the farm for the noon meal discovered the location of defendant, and also what he was doing, and went into his house and procured a pistol and started across his field to where defendant was; but the two eyewitnesses to the transaction introduced by the commonwealth testified that he put his pistol in his pocket and never drew it therefrom until after he was shot the first time by defendant. Those witnesses stated that about halfway from where defendant was, and the residence of deceased, was a cross-fence, and the part of the separated field contiguous to the creek was ploughed; that when deceased crossed the fence he was discovered by defendant, who went to his nearby automobile and procured his shotgun and then returned to the creek and stationed himself therein so as to be partially obscured by undergrowth, and when deceased got within about 30 yards of him he shot deceased in the breast and front part of his body; and that the latter did not have his pistol drawn nor had he taken it from his pocket. Upon being shot the witnesses stated that he did then draw his pistol, but the cylinder fell from it and he never fired a shot, although he pointed it

towards defendant, who shot the second time, and deceased turned with his back to defendant and started away, when the latter shot him the third time, taking effect in his back.

The physician witness testified that both the wounds in the front and in the rear were sufficient to produce his death, but which did not occur until the next day. Defendant testified that when he saw deceased cross the fence coming toward him, he released his team from the implement he was using to fill up the creek and went to his automobile with the intention and purpose of departing from the scene, but that he was so excited he could not start it. Whereupon he took his gun from it, and the shells he had carried along, and returned to the creek; that deceased on arriving in speaking distance of him cursed him, and that "he acted like he was going to draw the gun on me and I shot up in the tree top"; that deceased then came closer to the creek and again cursed him and began snapping his pistol at defendant, who then fired the first shot at him; that deceased then fell behind a tree but arose and again snapped his pistol, and defendant fired his third shot, and which the commonwealth's witnesses stated was while deceased was running away, and defendant did not in terms contradict that testimony. There was abundant proof of bad feeling between defendant and the Bellamys growing out of the latter cleaning out the creek and thereby, as defendant contended, obstructing his right to pass over it from his residence to the public road. There was proof of some threats made by deceased as to what he would do if defendant attempted to restore the bed of the creek, and the latter knew of such threats, and which, no doubt, explains the presence of his shotgun at the place and upon the occasion of the killing. In fact, one of the complaints made under error 1 is the refusal of the court to allow defendant and some county officers to testify that defendant asked them if he had the right to restore the creek as he attempted, and that he was informed that he did possess such right, but at the same time he was also warned, in substance, that if he attempted it he had better prepare for trouble, since the Bellamys were determined to prevent it.

It is seriously contended that the court erred in excluding such testimony offered to be given by not only defendant himself, but also by the officers whom he con-

sulted. The argument is that the court has the right to be placed in the situation of the parties and that the advice attempted to be proven bore on defendant's good faith as well as showing his peaceable and law-abiding disposition. It is furthermore claimed that it tended to destroy any illegal motive on the part of defendant in repairing to the scene of the homicide and engaging in the work he was doing. Whether that would be true if defendant had peaceably engaged in the work he was doing as would become a bona fide peaceable individual, i. e., without arms and implements of war, is a question that is not presented to us, since the fact of the warning that he attempted to prove, and his preparation therefor by going armed and providing himself with the necessary implements of war, indisputably establishes that "Barkis was willing," and that he intended, and actually attempted, to enforce his supposed rights by sheer force and without resorting to peaceable legal remedies, conceding, of course, that he possessed the right to travel the creek as a passway, and to require any obstructions thereto removed—a question that it is not necessary to determine in this case.

Voluntary manslaughter, as is everywhere held, may be committed where one willingly enters into a "mutual combat" with his antagonist, and while so engaged kills him. The homicide in such case is voluntary manslaughter, unless there is a good-faith abandonment, although the deceased may have first inflicted upon the defendant, or attempted to inflict upon him, bodily harm. It is made so in such circumstances upon the ground that defendant voluntarily entered into the affray and willingly engaged in the fight which would not be one unwillingly thrust upon him by deceased or by the wounded one if he was not killed. It is entirely unnecessary that we should cite cases from this and other courts or text-writers in substantiation of that principle of criminal homicide, since it is everywhere recognized and nowhere denied. Therefore, the evidence above referred to, if it had been admitted by the court, would have been more prejudicial to defendant than in his favor, and in such circumstances it would be unreasonable to contend that its exclusion operated to his prejudice. With it in the record, plus the proven threats of the deceased and the established ill feeling between the two combatants, it is perfectly clear that defendant made up his mind to undo the work that

had been performed by the two Bellamys in the bed of the creek, even if it brought about a personal encounter, and he carried along with him a weapon capable of inflicting death, and which he employed for that purpose. The whole engagement was thus voluntarily entered into on his part and was but the natural result of his purpose on that fatal morning and against which he was warned through the rejected testimony he offered to introduce and of which ruling he now complains. In the circumstances it is our conclusion that the court did not err in rejecting it; but if we were incorrect in that conclusion, then the rejected testimony was against defendant and his rights were not prejudiced by its exclusion.

In further support of this error it is also argued that the court should have permitted defendant to prove, as he offered to do, that after he had procured the warrant of arrest hereinbefore referred to, he made a statement that if the creek bed was restored to its former condition he would recommend that the prosecution be dismissed; but just what relevancy that statement, made by defendant in his own favor, could have on the merits of this prosecution, it is impossible for us to see. At any rate, no such proposition was accepted and defendant voluntarily undertook to redress his supposed wrongs in a manner that he knew would be calculated to bring on a combat which he prepared himself to prosecute by carrying along his gun. Of course, if the creek road should be restored, all of his preparation and activities looking to that end would become useless, but, after all, the essence of the inquiry is not what defendant desired to accomplish, but the method he employed to accomplish it and his intention and purpose to bring about that result at any cost, that constitutes the guilty facts in the case.

Neither did the court err in disallowing John Bellamy to testify to a threat that he had made against defendant. Not only is that true for the reasons we have already discussed, but for the additional one that there is no testimony connecting the deceased with any such threats made by his brother in his absence. It is, however, argued that the testimony was sufficient to show a conspiracy between John Bellamy and the deceased, and for that reason the threat made by the former was competent and admissible; but we do not so construe the testimony. If, however, it was otherwise and a conspiracy

was proven which had for its purpose the cleaning out of the creek by the two brothers, there is no testimony to show any conspiracy to prevent defendant, or any other person from restoring it.

It is also argued in support of this error that the court erred in refusing to permit John Bellamy to testify that he and his deceased brother had consulted the justice of the peace of the district as to whether they had the right to clean out the creek and that the officer declined to give permission for them to do so. Just why the court so ruled is not explained, since the officer was introduced and he testified fully on the subject, and stated that "I told him I hardly thought the Governor of the state could let him dig a ditch down the public road." So that, defendant got the full benefit of that testimony whether competent or incompetent. We believe that the foregoing discussion disposes of all of the rulings covered by error 1, but if not those overlooked are of the same unprejudicial nature and equally unmeritorious.

2. Scott Minton, an eyewitness to the homicide, and who testified for the commonwealth, was asked on cross-examination if he had not since the killing made a statement to Alfred Fitzgerald and his wife at their home that, "If Hanna would give you $250.00 you could clear the boy and would not have to swear a lie to do it." The answer was: "No, but they told me I could have got that out of him." No objection was made to that answer, but on re-examination of that witness on that subject the commonwealth's attorney sought to have him repeat it, but the court sustained defendant's objection thereto. The commonwealth's attorney in his closing argument in commenting on that testimony said:

> "Scott Minton never thought of such a thing as taking money from the defendant. It was Fitzgerald and not Minton who suggested that Minton could get money out of Hanna if Minton would testify to Hanna's advantage."

The attorney also in his argument in discussing the testimony to prove malice on the part of defendant referred to the fact that he had procured the prosecution against deceased but had not instigated one against his brother, John Bellamy, when the fact was that the prosecution inaugurated by defendant was against both. The

same attorney in his closing argument characterized the killing of the deceased as an assassination and said:

"Talk about him being a peaceable boy! Mr. Barnes (defendant's counsel) knows what we could show about this defendant's general reputation if they had opened it up, but they dare not open it up. We could not show it unless they first tried to show it was good. We had plenty of witnesses, any number of them. Some of them his kinspeople and we could show plenty, but they dare not let us do it. This defendant, this boy, as Mr. Barnes called him, is no angel. He has sprouted no wings."

It is contended in support of error 2 that all of the remarks of counsel referred to were improper and sufficiently prejudicial to authorize a reversal of the judgment, but we do not think so. The only argument referred to that could possibly be classified as improper is the one relating to defendant's reputation. Strictly construed it did not in terms charge defendant with a bad reputation. Moreover, the bill of exceptions points out that those remarks were made in response to an argument made by counsel for defendant in which he extolled the good reputation of his client whom he characterized as a "peaceable boy." If the language of prosecuting counsel had been sufficiently explicit to charge defendant with possessing a bad reputation, it was improper and the court should have excluded it.

However, section 340 of our Criminal Code of Practice prescribes, in substance, that a judgment of conviction in a felony case should not be reversed for any error committed at the trial, unless this court is satisfied "that the substantial rights of the defendant have been prejudiced thereby." That section of the Code is eminently proper and possibly has been disregarded in some cases to which it was intended to apply. In the trial of a case it is almost impossible for it to be conducted exactly in accordance with prescribed and approved rules of procedure, a departure from which creates a technical error. and if a reversal should be ordered in every such case it would be practically impossible to enforce the punishment imposed for infractions of the criminal laws. The members of the jury are not mere automatons, since they are presumed to be, and usually are, men of experience and intelligence. In this case they were defendant's fellow countians, and some of whom were perhaps, his ac-

quaintances. They also knew, as the court so instructed them, that they should try the case upon the evidence adduced at the trial; and to hold that under the facts of this case a reversal should be ordered solely because of the improper statement of counsel now under consideration would be but little short of making a mockery of the administration of the criminal laws. On the other hand, we think the case is one to which the provisions of section 340 of the code, supra, were intended to apply.

The other arguments referred to are plainly without merit, and upon the whole case it is our conclusion that defendant did what he purposed to do and what he had prepared himself to do if the occasion arose requiring it, and to the arising of which he was more or less indifferent. He extinguished a human life, which is the most sacred right that his victim possessed. He went prepared to do it, and if his rejected evidence had been admitted it proved that he had been previously warned as to the probabilities, and he accordingly prepared himself for it. Human life would be cheap if in such circumstances the excuses here offered for taking it were upheld, and the errors relied on for a reversal should be given that effect by this court.

We, therefore, conclude that upon the whole case the substantial rights of defendant were not prejudiced at his trial, and for which reason the judgment is affirmed.