## Frazier v. Commonwealth.

(Decided May 6, 1932.)

JOHN T. DIEDERICH and MONT WALKER for appellant.

BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Between 6 and 7 p. m. on December 24, 1930, within their residence located in a rural part of Boyd county, the appellant and defendant below killed her husband, Will H. Frazier, for which she was later indicted by the grand jury of that county and charged with murder. At her trial thereon she was convicted of voluntary manslaughter, and punished by confinement in the penitentiary for five years. The court overruled her motion for a new trial, and, from that order and the judgment pronounced on the verdict, she prosecutes this appeal, urging through her counsel as the sole ground for a reversal an alleged error of the court in sustaining the commonwealth's objection to certain testimony she offered to introduce.

Before discussing that single ground, we deem it appropriate to make a statement of the general outline of the facts as supported by the testimony. The parties had been married about 21 years, and had a daughter, Mabel, about 18 years of age. They had adopted a son, who was about six years old. In the corner of their yard was a country store building in which the deceased conducted a small merchandise business. On the fatal day, and for some time prior thereto, one Broomfield boarded with the Fraziers and occupied a room in their dwelling. Gertrude Baldridge lived nearby, and was a friend of the family. At about 11 a. m. on that day the defendant, Brumfield, and Miss Baldridge went to Ashland, Ky., some nine or ten miles away, on a pretended mission of assisting Brumfield in selecting a Christmas present for his mother, who lived in Louisa, Ky., and where he purposed to spend Christmas Day with her. The defendant and Miss Baldridge left Ashland and returned to the Frazier home between 3 and 4 o'clock, having remained in Ashland for three hours or more, but they rendered no

assisting aid to Brumfield after they arrived there, and he purchased his present after their departure for the Fraizer home. When the two arrived at the latter place, Miss Baldridge was put to bed in one of the rooms of the Frazier residence because, as the proof clearly shows, she was completely intoxicated. She did not testify, and it is claimed that she has never been seen or heard of since that time. After so caring for Miss Baldridge, defendant went to the store in the corner of the yard in which she found her husband, and one or two others, and she claims that he was intoxicated, but not staggering, since she testified that intoxication had no such effect upon him, but that she could tell when he had imbibed alcohol. Some words passed between them, and the deceased left the store and went to the residence, where he took off his shoes and coat and reclined on some kind of lounge or couch. He was soon followed by defendant, who claims to have seen him walking about in the room just before she entered the house, but that when she did do so he was lying down, and, as she claims, "pretended to be asleep," although she said that she knew he was not. She spoke to him but he did not answer, and she then approached him and took hold of him when he, according to her testimony, said: "God damn you, get away and leave my arm." That meeting ended with a fisticuff fight, according to defendant, in which she claimed that she lost some of her hair, and during the tussle a pistol was fired, which she claimed was produced by her husband; but at the time of the firing she was uncertain as to which one of the two had hold of it. At any rate, its discharge penetrated the head of the bed upon which the tussel was going on, with defendant the apparent aggressor.

Finally that melee ended without serious results, and defendant left the house and started to the store when her husband raised the window curtain as well as its sash, and watched her on her trip to the store, and he then had in his hands a pistol, which defendant claims he pointed towards her. However, no remark from him at that time, of an angry nature or otherwise, was proven. Directly thereafter deceased came out of his house with the pistol, and some of the witnesses say he also had a fruit jar containing what they concluded was liquor, and that he then stated: "I will end it, it won't be but just a few minutes," and he then went around the house and upon the top of a hill at the back of it from

whence some witnesses say they shortly thereafter heard some pistol shots, but others testified that they heard none.

In the meantime the defendant sent her daughter, Mabel, to Ashland for an officer, who shortly arrived, and, at defendant's solicitation, he searched the residence to see if deceased had returned, but he was not found, and the daughter returned to Ashland with the officer. Defendant obtained a shotgun that was in the store and went to the residence, with the officer, and what occurred after he left is testified to by her alone. She stated that after she entered the house, she, with the shotgun in her possession, took a seat in front of the fire with no lights in the room other than that furnished by the flames of the fire. There was a box close to the mantle in which kindling was deposited, and she stated that, after occupying that position for awhile, she heard a noise on the front porch and inquired if it was Mabel, her daughter, but she received no reply to her inquiry. Whereupon she stated that her husband fired a shot through the front door, the bullet striking the kindling box, but, unfortunately, it was immediately burned for kindling and was unavailable at the trial, and a number of witnesses introduced by the commonwealth testified that they could discover no bullet hole through the door, though defendant and her daughter, and one or two other witnesses, claimed to have seen one there the next morning. Immediately after the alleged shot she returned one through the door fired from the shotgun she had, and the testimony shows that some of the wounds found on the body of the deceased were produced by that shot, but they were not fatal ones. After she fired the gun she went into another room and in her excitement, as she claims, she broke the stock of it and threw it into the fire, leaving her with only its barrel, which she continued to carry.

In the meantime her husband opened the door and the young adopted son asked him for the pistol he had, which he readily delivered to the child, and he took it and put it in another room, when deceased took a seat in a chair. Defendant testified that when that was done she approached near to or within the door entering into that room and her presence was discovered by deceased, when he said: "Oh yes, you tried to kill me," and tried to arise from the chair when she approached him,

evidently for the purpose of keeping him from doing so, and he reached out his hands towards her and grabbed her clothing about the breast when she struck him on the head with the gun barrel and followed it with two or three more licks, which produced much bleeding and fractured his skull, and from which he shortly thereafter died, never having spoken from that time.

There was proof that defendant was drinking, having commenced while on the trip to Ashland with Brumfield and the Baldridge woman, and there was also proof that she was intoxicated that night after the fatal encounter. As stated, the deceased, if intoxicated at all, was not staggering, and it is not shown that he consumed but few drinks. It is in proof that when drunk he was more or less violent and defendant testified there had theretofore been frequent quarrels and imbroglios between the two and in which deceased would assault and strike her; but of course, the court properly declined to let her go into details, or to permit such occasions to be minutely investigated. He did, however, permit the fact of their occurrence to be told, and likewise permitted defendant to state the character of such assaults, i. e., by striking and bruising her.

It was also proven that defendant had not only prosecuted an action for divorce against her husband some two years before the homicide in a West Virginia court, where they were then living, but also that the action had progressed to a judgment, but which for some cause had never been entered of record. Witnesses testified to various prior threats made by defendant to the effect that if she could not get rid of her husband in one way she would by another, and it was proven and undenied that after deceased went upon the hill, and before his return, she uttered threats against him. Defendant's testimony was not attempted to be corroborated by her adopted child, although he was the only other person present at the time of, and immediately preceding, the killing. Whether he was a competent witness was a question to be determined by the court upon voir dire examination. Meade v. Commonwealth, 214 Ky. 88, 282 S. W. 781. But defendant made no effort to test his competency before the court by offering to introduce him, and she therefore stands uncorroborated as to the immediate facts and circumstances at the time of the killing, and her account of them does not by any

means produce conviction that she acted in her necessary self-defense, which was the only one interposed. Her testimony in its entirety is and was incoherent and disconnected, and, in giving it, she injected many immaterial and elaborate departures from a connected narrative. Its general tenor and the manner of giving it, as depicted in the record, has a tendency to detract from rather than to substantiate its convincing effect.

The offered and rejected evidence, so complained of, was directed to the same fact but proposed to be established by three separate witnesses, i. e., the defendant, the attorney who represented her in the divorce proceeding some two years before the killing, and a witness who was a toll collector on a bridge across the Big Sandy river; and we have concluded to state precisely what occurred with reference to each witness. After defendant had testified that she was afraid of deceased "because he had beat me and abused me so many times" (and which latter was permitted without objection), she was asked:

"Q. Before that time had he ever injured you in any way? A. Well, he would black my eyes all over my face and blackened my face up, and kicked me in the face, because the left is bigger in my cheek there."

The commonwealth objected and the court sustained it, and counsel made avowal, in which he incorporated a number of enumerated wounds that deceased had formerly inflicted upon defendant, and also some other matters indicating his nature and disposition, especially when intoxicated, and which latter were wholly unresponsive to the question.

Later in the trial, defendant's attorney in her divorce proceeding was introduced in her behalf and he testified about her visiting and employing him to bring that action, and he was then asked: "Q. What was her physical condition then?" To which the commonwealth objected and the court sustained it; defendant's counsel avowing that if the witness was permitted to answer he would say that there were bruises and wounds on various parts of her body. The toll collector was introduced by defendant, and, after stating that she frequently crossed the bridge at which he worked, he was asked: "Q. Did

you ever see her cross the bridge with her eyes blackened?'' To which the commonwealth objected and the court sustained it, followed by an avowal that on several occasions within the last two years when the defendant crossed the bridge her eyes were blackened.

The incidents so related are the only ones forming the basis of the sole ground relied on and argued for a reversal. To sustain it, counsel cite and rely on a number of cases from this court, as well as text-writers, upholding the right of defendant in a criminal prosecution (as tending to sustain his right of self-defense) to prove prior threats, assaults, and conduct of the deceased toward the defendant in order to establish his mental attitude toward accused, and to create in the mind of the latter the bona fide belief that he was in danger of death or bodily harm at the hands of the deceased because of such attitude. No attorney of repute will deny that thoroughly established rule, and it is conceded that the court in this case admitted the evidence offered by defendant covering its broad latitude. But it is insisted that this court, in the chief case upon which counsel rely, of White v. Commonwealth, 125 Ky. 699, 102 S. W. 298, 300, 1199, 31 Ky. Law Rep. 271, announced the broadening of that rule to the extent for which he now contends, and which is, that the defendant is entitled to prove the particular wounds, bruises, and other physical damage done to his person by his victim on such former occasions, regardless of their remoteness from the fatal occasion, and that it is a reversible error in all cases for the court to deny that right by excluding such offered testimony. To begin with, it is doubtful if the White opinion supports counsels' contention to the extreme limits embodied therein. In that case there was no other testimony of such former attacks, assaults, etc., than what was contained in the rejected testimony complained of, and for which a reversal was ordered, and in that opinion, during the course of discussing and approving the rule supra, it was said:

"We do not mean to say that it would have been proper for the court to have allowed evidence as to all the details of the cutting and wounding of appellant by deceased [on former occasions], or of the assault . . . with a club, but the fact that both assaults occurred, the *general* character of the injuries received by appellant at the hands of the

deceased, and the further fact that the latter was the attacking party should have gone to the jury in evidence." (Our italics.)

No fault can be found with the principle involved in that excerpt, but we do not conclude that it upholds the extended right insisted upon by counsel. However, were it otherwise, we are convinced that the alleged error in this case, as manifested by the references we have made to the record, was not prejudicial to the substantial rights of defendant, and, unless so, we are not authorized to reverse the judgment therefor under the express provisions of section 340 of the Criminal Code of Practice. We make that statement because, as we have hereinbefore pointed out, defendant was permitted to testify to such prior assaults, and in such a way as to confirm the effects produced upon her body therefrom. The offered and rejected testimony by the two witnesses, other than defendant, was not only remote, but there was no effort or offer to prove the cause of the conditions sought to be established (i. e., by assaults from her husband); and, while counsel cite a case from Michigan apparently holding that such failure would not render the evidence incompetent, we seriously doubt the soundness of that holding. If, however, it should be accepted as correct, then for the nonprejudicial reason hereinbefore adverted to the error in rejecting the testimony would not authorize us to reverse the judgment.

However, it should be noted that the question asked the attorney was: "What was her physical condition then?" It may, or may not have referred to temporary wounds that she carried upon her body. More appropriately it would appear that it was in inquiry as to the condition of her physical health, rather than directed to eliciting the bruised condition of her body. Also, it should not be overlooked that the ruling of the court on the objection to defendant's testimony did not exclude what she had already stated, but only stopped her from further proceeding, and in her unexcluded statement she told the jury all of the facts covering the extreme rule embodied in the White opinion, which it will be noted only went to the extent of permitting the introduction of "The general character of the injuries received," etc., and which, as we interpret that language, is complied with when defendant is permitted to prove in general

terms assaults upon him by deceased, followed by visible effects upon his body.

The section of the Criminal Code of Practice, supra, was enacted in view of the fact that the Legislature realized that no human tribunal is perfect, and that no trial is scarcely ever conducted precisely in accordance with prescribed rules of practice. Furthermore, that departures therefrom, not resulting in prejudicial error to the defendant on trial, would not justify the granting of a new hearing to be followed by reinvestigation of the issues. A contrary rule would not only result in the consumption of unnecessary time of courts, but would likewise be followed by unlimited cost to the commonwealth in an effort to enforce its criminal laws. A recent declaration of the application of that section is found in the case of Hanna v. Commonwealth, 242 Ky. 584, 46 S. W. (2d) 1098.

A careful reading of this record, as well as brief of counsel, fails to convince us that defendant did not have a fair and impartial trial, and for which reason the judgment is affirmed.